# Lessee of Thomas Lilly *against* George Kitz-miller.

Courses and distances run on the ground are the true survey; the return of the survey is only evidence thereof. His frauds or mistakes may be examined by parol proof. In Maryland the courses and distances *returned* to the proprietary office form the survey. A release to a person, otherwise interested, will make him a competent witness. Ex parte affidavits to establish independent facts, cannot be received in evidence. Agreement between the proprietaries of Pennsylvania and Maryland, of 4th July, 1760, cannot affect the rights of persons claiming under either proprietary previous thereto.

EJECTMENT for one messuage, grist mill, saw mill, &c. and 156 acres of land, in Manheim township.

The lessor of the plaintiff grounded his title on a Maryland patent for 6822 acres of land, dated 11th October 1735, founded on an original warrant for 10,000 acres, dated 1st April 1732, which, according to the custom of the land office of Maryland, had been renewed nine times: Also on a Maryland warrant of re-survey, to re-survey the ancient metes and bounds, correct errors in the first survey, and add contiguous vacancies, whether cultivated or not, dated 15th July 1745; a survey thereon of 3679 acres made October 1745, and patent dated 18th October 1745.

He also relied on the two agreements of the proprietaries of Maryland and Pennsylvania, the first dated 10th May 1732, under the 11th article whereof, "persons holding lands "under either of the proprietaries, though beyond the divi-"sion line of the two provinces, were secured and quieted in "their rights and possessions," and the order of the king in council made in pursuance thereof on the 25th May 1738; and the second agreement made on the 4th July 1760, under the proviso whereof it was declared, that "nothing therein "contained should be construed to extend to the respective "grantees or those claiming under them." He deduced his title under a will, divers mesne conveyances and descents, to the lands contained in both patents, remaining unsold by John Digges the original patentee, and Edward Digges his eldest son, who, by the jurisdiction of Maryland, being exercised over those lands in consequence of the mutual agreement of the proprietaries, and the royal order, until the final division line should be run, took the whole real estate as heir at law to his father.

The defendant's title rested on a warrant to Martin Kitz-miller, for 150 acres of land including his improvements, issued from the land office of Pennsylvania, dated 5th February 1747; *a survey thereon of 164 acres made 30th May 1759; a patent dated 17th September 1759, and [*29 a conveyance from the said Martin Kitzmiller and Juliana his wife, to the defendant, in consideration of 800l. It was

[Lilly v. Kitzmiller.]

proved that the defendant and his ancestor had been in possession of the lands in question since the years 1738 or 1739.

It was admitted on both sides, that the temporary line between the two provinces was run in 1739; the final division line run by Mason and Dixon, was completed in 1767, and that the proclamations of the respective governors issued in 1774.

The instructions of Lord Baltimore to Charles Carrol, esq. his agent, dated 12th September 1712, were also shewn by the defendant's counsel, whereby the mode of assigning warrants was pointed out, and wherein he directs that in each survey the boundary tree alone should be marked, and the courses and distances specified in the return of survey as the fairest mode and best calculated to prevent civil suits!

Hannah Owings was offered as a witness on the part of the plaintiff, to shew that one Edward Stevenson, the deputy surveyor, did not return the first survey as actually made by him on the ground, either by fraud or mistake; that the quantity of 10,000 acres was really contained within the lines of the lands run by him including the lands in question, and that upon making his plat and finding the figure to be very irregular, he got displeased, and swore he would not cast up the contents or return it in that form, and then reduced a number of lines into one, struck off five or six angles in different places, and made a new plat different from the courses and distances run on the land, and of 270 courses contained in the field notes, which were several years in his possession, he left out about 150 of them, and that the witness afterwards delivered those notes to John Digges the patentee.

The defendant's counsel excepted to this testimony on three grounds. Because, 1st, The witness was not present at the survey. 2d, She contradicts the return of the survey, which practice would necessarily engender disputes and perjuries, and place the security of landed titles on the frail memory of witnesses. 3d, Stevenson, the deputy surveyor, was agent both for Lord Baltimore and his patentee.

But the court overruled these objections without difficulty. They asked, how could frauds or mistakes be otherwise detected unless by parol testimony in most instances? A proprietary surveyor was not an agent (properly so called) for the peo*ple whose lands he surveyed. He was appointed by the proprietor, and removable by him alone. Such a surveyor by his return could not bar the title of a person which was vested in him by an actual survey. The courses and distances run on the ground are the true survey, but the return of the surveyor is only evidence of it, and not conclusive.

The witness was accordingly sworn.

(Note.—The instructions from Lord Baltimore in 1712, to

[Lilly v. Kitzmiller.]

his agent Mr. Carrol, were not given in evidence until the defendant's title was afterwards shewn.)

The deposition of John Shreyer, taken in pursuance of a rule of court, was offered in evidence on the part of the defendant, but objected to, because he was said to be interested. The proof to shew this was by Conrad Dotterer, who voluntarily swore (he could not have been compelled) that Shreyer had sold him 100 acres of the lands contained in the original patent to John Digges, and a tract of land under a Pennsylvania right, which would fall within the re-survey. Hereupon a release from Dotterer to Shreyer, executed before the taking of the deposition was shewn, releasing to him all demands under the covenants in the deed.

Mr. Lewis *pro quer.* cited Gilb. Law Evid. 130. "A wit-"ness who has part of the land sells, though *bona fide*, and "for good consideration; if it be after he is summoned to be "a witness, or after he has had notice of the trial, the court "will not admit his evidence;" and contended that the same mischief which the above principles guarded against existed in the present instance: But the court disallowed the objection, and said, it was every day's experience to admit persons to give evidence under such releases, purging any interest that they might eventually have in the matters in controversy, though made at the bar during the trial; and the deposition was read accordingly.

An *ex parte* affidavit of John Leman, sen. (who was proved by Hannah Owings to have first settled on the lands in controversy under John Digges, but who declared to the said Digges in 1752, according to the testimony of his son John Leman, junr. in open court, that he had settled on the same under a Pennsylvania right) taken before Nathaniel Wickham a justice of the peace of Frederick county, in Maryland, on the 21st February 1754, authenticated by a certificate under the seal of the said county that he was a justice, and that the subscription was his hand writing, and the hand writing of the said justice having *been also proved by [*31 a witness in open court was offered in evidence on the part of the plaintiff, to prove that the said John Leman, sen. had in the years 1735 or 1736 agreed with John Digges for 100 acres of the lands now occupied by the defendant, and had received orders from Digges to his agent Robert Owings to survey the same for him; that he continued there some time, and had a son born on the land, and afterwards sold his improvements to Martin Kitzmiller, who in 1737 or 1738, came to live on the land. The same was objected to by the defendant's counsel for five reasons. Because 1st. It was not ascertained that the same John Leman who made the affidavit, was the same person who made the first settlement. 2d. If the witness swore what was false he could not be

convicted of perjury, the oath being voluntary. 3d. The affidavit was taken *ex parte*, and it is against natural justice that a man should be concluded in a cause to which he was no party, and where he had no liberty to cross examine the witnesses. Gilb. Law of Evid. 60. 4th. The affidavit does not go to ascertain boundary, concerning which the rules of evidence are very lax, from the necessity of the case, but is brought forward to establish independent facts, and vest a title to the whole of the lands in controversy. And 5th. Because of the inconveniences which must necessarily result from the introduction of such testimony.

The plaintiff's counsel answered that better evidence would not be expected, than was in the power of the party to procure. It rested on the foot of necessity, as the facts attempted to be proved happened above fifty years ago, and no one could keep his witnesses alive. The affidavit of Leman was also considered as a letter, written by him, with the attestation of the justice as a witness. It is proved that he came in under the title of Digges, though denied by his son, who shews other declarations on his part; and as the defendant does not produce the conveyance or transfer which his ancestor obtained from Leman, this paper, in nature of a letter, explains the transaction, and are his written declarations some years after the time, shewing the rights under which he held possession and what rights he sold.

But the court overruled the affidavit, being taken *ex parte*, and evidently brought forward not to ascertain boundary but to establish independent facts, which would in the event be productive of the most dangerous consequences.

Two other *ex parte* affidavits of Robert Owings taken 18th July, 1746, before a justice of Baltimore county, authenticated as *above, and proved by a witness to be the hand writing of the justice, were offered in evidence on the part of the plaintiff, to prove that in 1732 or 1733, John Digges directed him to lay out and dispose of sundry parcels of land, which he accordingly did, and that the lines run did not extend beyond the limits of the first survey; that the lands laid out for John Leman and others were actually in the original survey except a few corners, and that the witness believed that Edward Stevenson, the deputy surveyor, actually omitted part of the lines by him really run.

And also one other *ex parte* affidavit of Thomas Prather, who made the re-survey, (authenticated as above) without a date, was offered in evidence on the part of the plaintiff to prove that in 1747 he executed the warrant of re-survey; that John Digges ordered Robert Owings to attend him during that service, and Digges and Owings both told him that Stevenson, the deputy surveyor, was to receive his directions from Owings in making the original survey, and the witness

[Lilly *v.* Kitzmiller.]

also was, by Digges's order, to receive his directions in making the re-survey; that his orders from Digges were to run the old lines as nearly as possible, and rather to leave out land than take in different lands; and that Owings told witness that Digges intended originally to survey the whole 10,000 acres of land there, and which were actually included in the lines really run by Stevenson.

But the defendant's counsel objected to the reading of the said last three depositions, for the four last reasons mentioned as their grounds of exception to John Leman's testimony.

And the court, on argument, overruled the same, *causis quibus supra.*

The court, however, at the instance of the counsel, reserved the points of testimony herein before resolved, to be considered and determined in bank, in case the counsel on either side should think proper to move them: (But they were not stirred again.)

The court, in their charge to the jury, after summing up the title of the plaintiff and defendant to the lands in question, said in substance as follows:—The lands in dispute lie four miles north of the boundary line between the states of Pennsylvania and Maryland. Independent of the proprietaries' agreements, Lord Baltimore could have no right to grant lands beyond the limits of his province. Whatever, however, was granted by either proprietor, though beyond their respective limits, before the royal order of 1738, was secured to the settlers by their mutual agreement. But the subsequent agreement of 1760 could not affect the rights of persons claiming under either proprietor pre*vious [*33 thereto. The great question in this cause is, whether the first survey included the lands now possessed by George Kitzmiller, the defendant.

It appears to us there is a failure in the plaintiff's title in this early stage of it. Under the practice in Pennsylvania of making proprietary surveys, trees are marked on the ground, and where there are no trees or natural boundaries, artificial marks are set up to distinguish the survey. By these means, if the surveyor return a draft different from the courses and distances actually run, the mistake is easily corrected. Should the surveyor commit an error in his return, it shall not affect the rights of the party. Such cases have frequently happened.

But the case is very different under the ancient practice of making surveys under the proprietaries of Maryland. Such surveys were merely ideal, and precisely fixed on paper alone. No trees were marked except the beginning boundary. Lord Baltimore's instructions of 1712 to his agent, Mr. Carrol, which have been read, clearly shew us what his intentions were, and that he was concluded only by the courses and

[Lilly *v.* Kitzmiller.]

distances returned. The survey was ambulatory—not confined to a certain spot of land, but was governed by the variation of the compass, and was continually shifting. The courses and distances returned formed the survey, and determined on an exact admeasurement the particular lands granted, as often as they were run. Those courses and distances alone were binding on the proprietor, and consequently on his patentee. It necessarily follows under our idea, that as the testimony of Hannah Owings, or any other circumstances shewn in this cause, cannot establish a title to lands without the limits of the original survey as returned, that the plaintiff must fail in the present suit.

We mean, however, in thus giving our opinion, which we have taken some pains to form, to confine ourselves to the express case before us. It is not intended to affect other rights. Persons who have bought lands from Messrs. Digges, even within the re-survey, may have acquired titles by their possessions and improvements, which should not now be shaken.

The jury retired from the bar early on Sunday morning, and soon agreed on their verdict, but the plaintiff took a nonsuit.

Messrs. Randolph, Lewis, Hartley, and Smith *pro quer.*

Messrs. Bradford, J. Smith, and Bowie *pro def.*

Cited in 14 Pa., 64, to support the proposition that courses and distances run on the ground are the true survey.